UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. –

LACY DOYLE,

Defendant.

16 Cr. 506 (ALC)

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S DISCOVERY MOTIONS**

PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jared Lenow
Katherine Reilly
Assistant United States Attorneys
    *Of Counsel*

# Table of Contents

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 1

    A. Procedural History ............................................................................................ 1

    B. The Offense Conduct ....................................................................................... 2

ARGUMENT .................................................................................................................. 3

    I. The Government Has Complied With Its Rule 16 Obligations .................................. 3

    II. The Government Has Complied With Its Obligations Under *Brady* ........................ 6

    III. The Government Will Produce Jencks Act and *Giglio* Material In Accordance With the Standard Practice in this District.................................................................... 10

    IV. The Marital Communications Privilege Was Not Violated.................................... 14

    V. The Defendant's Discovery Obligations............................................................. 20

CONCLUSION............................................................................................................. 20

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Lacy Doyle's discovery motions. The defendant seeks an order directing the Government to produce (1) Rule 16 discovery; (2) *Brady* material; (3) Jencks Act and *Giglio* material two weeks before trial; and (4) statements of the defendant's former spouse (the "Spouse"), who is a potential Government witness, due to alleged violations of the spousal communications privilege.

The defendant's motions are wholly without merit, and should be denied. The Government is aware of and has complied with its Rule 16 and *Brady* obligations. And there is no legal basis for the defendant's request for two-week advance disclosure of Jencks Act and *Giglio* material; in fact, the Second Circuit has repeatedly held that a district court is *prohibited* from mandating the early production of Jencks Act material. Finally, the Government did not violate the marital privilege, but the Government has provided the necessary information about the Spouse's statements to allow the defendant to file any suppression motion well in advance of trial.

## BACKGROUND

### A. Procedural History

The defendant is charged with two offenses: (1) obstructing and impeding the due administration of the internal revenue laws from 1989 through 2012, in violation of Title 26, United States Code, Section 7212(a); and (2) subscribing to a false and fraudulent U.S. individual income tax return in 2010.

The defendant surrendered to authorities on these charges on July 28, 2016, and was presented on that date. On August 15, 2016, the Government produced all foreign account and entity documents in its possession relating to the charged scheme, as well as copies of the

defendant's tax filings, along with other materials.   The Government has since made several supplemental productions.

## B.  The Offense Conduct

The offense conduct is described in detail in the Indictment, and can be roughly divided into two categories.  Both categories of conduct were part of the defendant's ongoing scheme to obstruct and impede the administration of U.S. tax laws.

First, between 1989 and 2011, the defendant maintained financial interests in various foreign bank accounts that were held in her own name, in the Spouse's name, or in both her name and the Spouse's name.   Indictment ¶¶ 16-23, 40-42.  For certain tax years, the defendant failed to report any income from foreign accounts in her tax filings, and also stated in those filings that she did not have an interest in or signature or other authority over a financial account in a foreign country.  Id. ¶ 44.  Some of those filings were made jointly with the Spouse.

Second, the defendant engaged in a scheme to establish and maintain a foreign trust, Gestino Stiftung, during the period 2006 through 2012, to hold Swiss bank accounts in order to conceal those bank accounts from U.S. tax authorities and to evade U.S. tax obligations. Indictment ¶¶ 24-29, 43-44, 46.  The story of that trust begins in 2003, when the defendant's father died and secretly left her an inheritance of over $4 million.  Id. ¶¶ 24-25, 27.  The defendant, who was also executor of her father's estate, made court filings falsely stating under penalty of perjury that the total value of her father's estate was under $1 million when, in truth and fact, it was more than four times that amount.  Id. ¶¶ 25-27.

In 2006 the defendant enlisted the assistance of Beda Singenberger, a Swiss citizen who ran a financial advisory firm, to open a Swiss bank account into which the secret inheritance was deposited.  Id. ¶ 27.   To conceal the existence of the Swiss bank account from United States

authorities and others, the defendant, with the assistance of Singenberger, established a Liechtenstein foundation, "Gestino Stiftung," to hold the Swiss bank account in its name.  Id. ¶ 27.  As of December 31, 2008, the account held currency and financial instruments valued at approximately $3,548,380.  Id. ¶¶ 32-33.

The defendant used this arrangement to unlawfully and fraudulently avoid paying over $1.5 million dollars in United States taxes resulting from the secret inheritance.

In 2010, the Gestino Stiftung was re-domiciled from Lichtenstein to Panama.  Id. ¶¶ 35, 37.  As of May 31, 2010, the Gestino Stiftung maintained assets in various Swiss bank accounts in the amount of at least approximately $3,151,961.37.  Id. ¶ 36.

## ARGUMENT

## I.  The Government Has Complied With Its Rule 16 Obligations

Courts in this District generally accept the Government's representation that it has complied with its Rule 16 obligations at face value.  *See, e.g.*, *United States* v. *Okpomo*, No. 09 Cr. 143 (LBS), 2009 U.S. Dist. LEXIS 38138, at *11 (S.D.N.Y. May 4, 2009) (Sand, J.) ("With respect to Defendant's request for a copy of all warrant applications and orders, the Government has indicated that it has complied with its Rule 16 obligations.  Because of the Government's representations, this request appears to be moot."); *United States* v. *Ordaz-Gallardo*, 520 F. Supp. 2d 516, 518-519 (S.D.N.Y. 2007) (Robinson, J.) ("This Court has no reason to believe that the Government has not acted reasonably and in good faith to comply with its Rule 16 obligations, and is satisfied with the Government's representations that it will continue to do so."); *United States* v. *De La Cruz*, No. 05 Cr. 773 (NRB), 2006 U.S. Dist. LEXIS 55725, *8 (S.D.N.Y. Aug. 8, 2006) (Buchwald, J.) ("This Court has no reason to believe that the Government has not acted

reasonably and in good faith to date and is satisfied with the Government's representations [that it had complied with its Rule 16 obligations.]").

The Government is aware of its disclosure obligations under Rule 16, and has complied with them.  The defendant has been provided with substantial discovery in this case, including copies of all foreign bank and entity records in the Government's possession that relate to the charged offenses and the defendant's tax filings for the relevant time period.  Indeed, the Government has gone beyond its Rule 16 obligations in this case, providing substantial materials that need not be produced at this stage, including draft translations of foreign language materials, Government requests to foreign countries for investigative assistance, and certain prior statements of Government witnesses (such as emails and work product for several of the defendant's accountants).  The Government understands that its Rule 16 obligations are ongoing.  Should the Government's continuing investigation yield additional Rule 16 materials, they will be produced.

With respect to the defendant's specific demands, the Government provides the following responses:

 **"Illegible and/or redacted documents"**: The Government has produced documents in the same state that they were provided to the Government.  To the extent the Government obtains more legible or nonredacted versions, they will be produced to the defendant.

**"Non-translated foreign bank and corporate documents"**: As noted above and at the initial conference in this matter, the Government has provide the defendant with all of the Government's draft translations of foreign language materials in this case.  To the extent the Government has additional translations made, and intends to use those at trial, the Government will produce them in advance of trial.

4

The defendant's request for an arbitrary and inflexible two month "bar date" for the production of any translations is premature and unnecessary in light of the fact that (1) a trial date has not even been set in this matter and (2) the Court has broad power to fashion appropriate remedies in discovery matters should the need arise. *See* Fed. R. Crim. P. 16(d) (court may grant a continuance, prohibit introduction of evidence, or "enter any other order that is just under the circumstances" as a remedy for a failure to comply with Rule 16 obligations); s*ee also United States* v. *Thai*, 29 F.3d 785, 804 (2d Cir. 1994) (no prejudice to defendant when Government produced English language translation of recording during trial because, among other reasons, defendant had the foreign language recording prior to trial and had a translator listen it, and district court offered to allow counsel more time to prepare for cross-examination as a remedy).

**"Documents undergirding particular allegations in the Indictment"**: "Although Rule 16(a) provides a mechanism for liberal discovery, it was not intended to provide the defendant with access to the entirety of the government's case against him." *United States* v. *Percevault*, 490 F.2d 126, 130 (2d Cir. 1974). "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *United States* v. *Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 U.S. Dist. LEXIS 6632, at *15 (S.D.N.Y. Apr. 15, 2002). As noted above, the Government is aware of its disclosure obligations under Rule 16, and has complied with them. Should the Government's continuing investigation yield additional Rule 16 materials, they will be produced.

With respect to the basis for the border patrol search of the defendant at JFK airport after her arrival from France (which resulted in border officers copying and then returning financial documents in the defendant's possession, and observing the defendant to be in possession of a

large quantity of currency) the Government notes that search was performed pursuant to the border search exception to the warrant requirement. *See United States* v. *Irving*, 452 F.3d 110, 123-24 (2d Cir. 2006) ("Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion. Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights.").

With respect to the defendant's request for materials relating to any cooperating witnesses or entities in this case, the Government will produce any required Jencks Act or *Giglio* material as set forth below.

Therefore, there is no need for the Court's intervention as to the Government's Rule 16 discovery obligations, and the defendant's motion on that issue should be denied.

## II.  The Government Has Complied With Its Obligations Under *Brady*

Pursuant to the Due Process clause of the United States Constitution, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to guilt or to punishment. *See Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), even if the evidence is only in the possession of the investigating officers and not in the direct possession of the prosecutors, *see Kyles* v. *Whitley*, 514 U.S. 419 (1995). Favorable evidence includes evidence that tends to exculpate the accused, *see id.*, as well as evidence that is useful to impeach the credibility of a government witness. *See Giglio* v. *United States*, 405 U.S. 150, 154 (1972). As the Court of Appeals has explained, *Brady* and *Giglio* material must be provided by the Government "in time for its effective use at trial." *In re United States (U.S. v. Coppa)*, 267 F.3d 132, 146 (2d Cir. 2001).

6

"The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States* v. *Le Roy*, 687 F.2d 610, 619 (2d Cir. 1982) (holding that Government was not obligated to disclose allegedly exculpatory grand jury testimony when the defendant was "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish.").   "Thus, *Brady* requires the prosecutor neither to deliver his entire file to defense counsel, nor to make a disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *Tate* v. *Wood*, 963 F.2d 20, 25 (2d Cir. 1992) (internal citations and quotation marks omitted); *see also United States* v. *Corey*, 566 F.2d 429, 431 n.5 (2d Cir. 1977) (prosecutor has no obligation to bring to the defendant's attention matters which he already knows); *United States* v. *Jacques Dessange, Inc.*, 2000 U.S. Dist. LEXIS 2886, 24-25 (S.D.N.Y. Mar. 13, 2000) ("Evidence, even if exculpatory and material, is not required to be disclosed, however, if the defendant knows or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." (internal quotations omitted)).

As stated in the Government's first discovery letter to defense counsel, the Government is not aware of any *Brady* material in this case.  The defendant admits that its claims to the contrary are purely speculative.  *See* Defendant's Discovery Motions at 15 ("We of course cannot intelligently guess at what exculpatory information and documents are in the possession of the Government or its cooperators.").  The Government does, however, recognize its continuing obligation to disclose all such material, and to make a diligent search for any relevant material that

7

may be in the possession of the "prosecution team," including investigating agents and officers. The Government will continue to provide timely disclosure of any additional *Brady* material when and if any such material comes to light.

Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady.  *See, e.g.*, *United States* v. *Barone*, No. S1 09 Cr. 91 (NRB), 2010 U.S. Dist. LEXIS 73629, at *3 (S.D.N.Y. July 9, 2010) (Buchwald, J.) ("We have no reason to doubt the Government's representation that it has faithfully complied with its disclosure obligations and will continue to do so.  Under these circumstances, no further order from the Court is warranted."); *Okpomo*, 2009 U.S. Dist. LEXIS 38138, at *5 (Sand, J.) ("Courts in the Second Circuit have repeatedly rejected requests for immediate production of *Brady* material where, as in this case, the Government has made a good-faith representation that it recognizes and has complied with its disclosure obligations under *Brady*."); *United States* v. *Ordaz-Gallardo*, 520 F. Supp. 2d 516, 522 (S.D.N.Y. 2007) (Robinson, J.) ("As the Government has, in good-faith, asserted that it has met, and will continue to meet its obligations, there is no reason to compel disclosure of *Brady* material at this time."); *United States* v. *Birkett*, No. 99 Cr. 338 (RWS), 1999 U.S. Dist. LEXIS 13475, at *16 (S.D.N.Y. Sept. 2, 1999) (Sweet, J.) ("Courts in this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to *Brady* where the Government, as here, has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady. . . .  The Court accepts the Government's representation that it will provide timely disclosure if any Brady material comes to light."); *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 U.S.

8

Dist. LEXIS 103, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (Koeltl, J.) (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any Brady material to the defense well before trial").

The defendant's request that the Court conduct an in-camera review of the IRS Special Agent's Report (SAR) in this case, which is internal and confidential investigative work product, is unwarranted and without foundation. Such materials do not fall within Rule 16, and must be produced under the Jencks Act only if the author of the report is called as a witness. *See United States* v. *Siraj*, 533 F.3d 99, 102 (2d Cir. 2008) (agent report not discoverable under Rule 16). The Second Circuit has held that it is appropriate for a district court to conduct an *in camera* review of a SAR in limited and narrow circumstances not present here. In *United States* v. *Sternstein*, 596 F.2d 528, 529 (2d Cir. 1979), the authority relied on by the defendant, the Court ordered the *in camera* review of a SAR because the Government had previously permitted defense counsel to review the SAR, and thus defense counsel was able to point to specific information in the report and explain the relevance of that information to the defense. *Id.* at 529-30 ("There is no doubt but that the request made here was specific. It was based upon documents which were initially shown, albeit briefly, to appellant's trial counsel and were clearly identified in Sternstein's written motion."). The alleged specific information in that case was that in-depth interviews of taxpayers conducted by IRS agents revealed that only 9 of 900 tax returns prepared by the defendant (a tax preparer) contained erroneous tax deductions, thereby bolstering the defense argument that those errors were merely careless. *Id.* at 530. Here, in contrast to *Sternstein* the defendant cannot point to specific information in the SAR that would be exculpatory; rather, the defendant's request is

9

simply a fishing expedition aimed at securing premature disclosure of Jencks Act material ("the identity of witnesses or their statements") that may contain "any exculpatory information." Defendant's Discovery Motions at 16-17.

The defendant also seeks *in camera* review of any tax loss calculations in the SAR, but does not provide any explanation as to why such a calculation would be exculpatory.  As the Government has informed defense counsel, the Government has produced all of the relevant account, tax return, and other documents in its possession that would form the factual basis for any tax loss calculation.   The Government's current assessment, based on the facts known to the Government as of the filing of this response, is that the tax loss is in excess of $1.5 million based largely on the evasion of the estate tax when the defendant's father died in 2004.   Of course, that assessment is subject to revision based on new information, and the Government's investigation in ongoing.  To the extent the Government decides to offer an expert report or other testimony about tax loss at trial, the Government will provide notice of it on the timetable set by the Court for expert reports and 3500 material.

In sum, the Government has complied with its *Brady* obligations, and therefore there is no reason to compel disclosure of *Brady* material at this time

## III.   The Government Will Produce Jencks Act and *Giglio* Material In Accordance With the Standard Practice in this District

There is no legal basis for the defendant's request for two-week advance disclosure of prior statements of the Government's witnesses.  The law is clear in this circuit that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 *et seq.*, to produce prior statements of its witnesses until after each has testified on direct examination.   The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500.

In fact, the Second Circuit has repeatedly held that a district court is *prohibited* from mandating the early production of Jencks material. *See, e.g., United States* v. *Coppa (In re United States)*, 267 F.3d 132, 145 (2d Cir. 2001) (noting that "[w]e have previously held that the Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements," and granting petition for a writ of mandamus to reverse district court's order for early disclosure of 3500 material); *In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987) (granting mandamus to vacate order requiring pretrial production of witness statements); *United States* v. *Percevault*, 490 F.2d 126, 129, 131 (2d Cir. 1974) (noting that "the prosecution cannot be compelled to disclose statements of the witness before he has testified on direct examination," and reversing order suppressing witnesses' testimony on the grounds that the Government did not produce witness statements in advance of trial despite being ordered to do so). This is because the Jencks Act "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial." *Percevault*, 490 F.2d at 129.

However, to avoid delays at trial that may result from the disclosure of Jencks material after each witness has testified, the longstanding custom in the Southern District of New York is for the Government to disclose such material the Friday before trial. *See, e.g., United States* v. *Opinion Austin Romain*, No. 13 Cr. 724 (RWS), 2014 U.S. Dist. LEXIS 50759, at *7-8 (S.D.N.Y.

11

Apr. 10, 2014) (Sweet, J.) ("In any event, the Government, in accordance with common practice, will provide all such materials on the Friday before the start of trial.  Such notice is sufficient under the applicable law."); *United States* v. *Razzoli*, No. 12 Cr. 550 (DLC), 2012 U.S. Dist. LEXIS 161672, at *11 (S.D.N.Y. Nov. 8, 2012) (Cote, J.) (3500 material made available to defense the Friday before trial); *United States* v. *Barone*, S1 09 Cr. 91 (NRB), 2010 U.S. Dist. LEXIS 73629, at *3 (S.D.N.Y. July 9, 2010) (Buchwald, J.) ("With respect specifically to the request for early disclosure of § 3500 materials, the Court recognizes the limits of its authority in that regard but encourages the Government to begin disclosure of those materials earlier than is customary (*i.e.*, the Friday before trial)."); *United States* v. *Young Son Im*, 2009 U.S. Dist. LEXIS 66022, at *27 (S.D.N.Y. July 17, 2009) (Castel, J.) (noting that 3500 material was produced the Friday before trial); *Okpomo*, 2009 U.S. Dist. LEXIS 38138, at *8 (Sand, J.) (noting that the Government had agreed to "comply with the standard practice of producing impeachment and Jencks Act material at the same time--that is, the Friday before the start of trial, or if additional time is reasonably required to review the material, sufficiently in advance of the witness's testimony to avoid any trial delays"); *United States* v. *Noble*, No 07 Cr. 284 (RJS), 2008 U.S. Dist. LEXIS 37184, at *26-27 (S.D.N.Y. May 7, 2008) (Sullivan, J.) (noting that "the government agreed to produce any § 3500 material 'on Friday before trial, consistent with its standard practice'"); *United States* v. *Reyes*, 417 F. Supp. 2d 257, 262 (S.D.N.Y. 2005) (Swain, J.) (Jencks material produced Friday before trial).  The Government understands that practice has been followed in prior criminal trials before this Court in particular.  *See, e.g.*, *United States* v. *Figueroa*, 12 Cr. 233 (ALC).  The Government intends to produce Jencks material in this case in accordance with this longstanding practice.

The defendant's request for two-week advance disclosure of impeachment material under *Giglio* is similarly without foundation.  "The Second Circuit requires only that impeachment material be disclosed 'in time for its effective use at trial.'"  *United States* v. *Canter*, 338 F. Supp. 2d 460, 462 (S.D.N.Y. 2004) (quoting *Coppa*, 267 F.3d at 142); *see also United States ex rel. Lucas* v. *Regan*, 503 F.2d 1, 3 (2d Cir. 1974) ("Neither *Brady* nor any other case we know of requires that disclosures under *Brady* must be made before trial.").  "[I]mpeachment material ordinarily need not be disclosed until the witness is called to testify at trial, as such material 'does not ordinarily require any independent investigation in order to [be used] effectively at trial.'"  *Okpomo*, 2009 U.S. Dist. LEXIS 38138, at *6 (Sand, J.) (quoting *United States* v. *Jacques Dessange, Inc.*, No. 99 Cr. 1182, 2000 U.S. Dist. LEXIS 2886, at *29 (S.D.N.Y. Mar. 14, 2000) (Cote, J.)).

As with Jencks material, the custom in the Southern District of New York is for *Giglio* material to be produced the Friday before trial.  *See, e.g.*, *Reyes*, 417 F. Supp. 2d at 261 (Swain, J.) ("The practice in this District is to provide both *Giglio* and Jenks Act material at the same time, which should be at least one day prior to the testimony of the witness."); *Canter*, 338 F. Supp. 2d at 462 (Marrero, J.) ("It has been the practice of this Court and of other courts in this district to require that the Government produce these materials a few days before the start of trial, usually on the Friday before a trial scheduled to start on a Monday."); *United States* v. *Mejia*, No. 98 CR 4, 1998 U.S. Dist. LEXIS 11923, at *2, 1998 WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998) (Koeltl, J.) (holding that "[i]t is well-established that a defendant not entitled to [*Giglio* material] in advance of trial, and endorsing Government's proposal to provide such material at the same time as Jencks material); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (Sweet, J.) ("Following

13

the usual practice in this District, the government has agreed to make impeachment information available to the defense at the same time as Jencks Act material, i.e., 'one day prior to the day the witness is called to testify on direct examination,' or, if additional time is reasonably required to review such material, sufficiently in advance of the witness' testimony so as to avoid any delay at trial. . . . This practice will allow defense counsel adequate time to prepare for cross-examination of government witnesses as they testify at trial.").

The defendant cites a table of pretrial disclosure schedules set in twelve of the longest and most complex recent trials in this District, including the Madoff and S.A.C. Capital trials, as examples of a "typical disclosure schedule." Defense Discovery Motions at 17; Leibman Decl. ¶ 15 & Ex. 3. Almost all of those twelve cases were securities fraud cases with millions of pages of discovery and numerous witnesses, and are not appropriate comparators for this case. At this time, the Government does not anticipate that its Jencks Act and *Giglio* production will be particularly voluminous. To the extent that changes, the Government would be open to considering, in its discretion, an earlier production.

There is no legal basis for the defendant's request that the Court order a two-week advance disclosure of Jencks Act and *Giglio* material, and the motion should therefore be denied.

## IV.  The Marital Communications Privilege Was Not Violated

During this investigation, the Government learned that the defendant and the Spouse (who was married to the defendant from 1984 through 2009) were jointly engaged in a criminal scheme to hide foreign accounts and income from the IRS. In light of those facts, the Government questioned the Spouse about statements made by the defendant about foreign bank accounts in which the defendant had an interest during the time period in which the defendant and the Spouse were illegally and actively concealing these accounts from the IRS, including by falsely affirming

14

on their joint tax returns each year that neither had an interest in any foreign bank accounts.  Under Second Circuit law, those communications are not privileged, and were appropriately elicited by the Government.

     The Second Circuit has summarized the law of spousal privilege as follows:

> The common law rules of testimonial privilege recognize two distinct marital privileges.  The adverse spousal testimony privilege permits an individual to refuse to testify in a criminal proceeding against her or his spouse.  This privilege rests on the notion that a husband and wife should be able to trust each other completely, and that marriage is a sanctuary.  The privilege is described as being 'broadly aimed at protecting marital harmony.'  The second marital privilege -- the confidential marital communications privilege -- is narrower than the adverse spousal testimony privilege and seeks only 'to protect the intimacy of private marital communications,' but it can be invoked by either spouse to prevent the revelation of such communications.

*United States* v. *281 Syosset Woodbury Rd.*, 71 F.3d 1067, 1070 (2d Cir. 1995) (quoting *In re Grand Jury Subpoena United States*, 755 F.2d 1022, 1027 (2d Cir. 1985)).  Here, the only privilege asserted by the defendant is the narrower confidential marital communications privilege.  "Normally, the confidential communication privilege extends only to utterances and not to acts." *United States* v. *Estes*, 793 F.2d 465, 467 (2d Cir. 1986).

     One well-established exception to the marital communications privilege is the joint crime exception.  Under that exception, the privilege may not be invoked to prevent a spouse from testifying willingly about the couple's joint criminal activities.  *281 Syosset Woodbury Rd.*, 71 F.3d at 1073 (exception applies "when 'the spouse of an accused [would] testify willingly concerning their joint criminal activities.'" (quoting *United States* v. *Estes*, 793 F.2d 465 (2d Cir. 1986)).  The rationale for that exception is that "greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would

come from permitting the accused to erect a roadblock against the search for truth." *Estes*, 793 F.2d at 468.

Also, "[l]ike other testimonial privileges protecting confidences, the confidential marital communications privilege may be waived by some act of testimony which in fairness places the person in a position not to object to further disclosure." *281 Syosset Woodbury Rd.*, 71 F.3d at 1072 (internal citations and quotation mark omitted). "[A]n act of testimony can constitute a waiver of the privilege when the witness's prior statements create a risk that the truth will be distorted and when the witness should reasonably have known that his or her statements would be interpreted as a waiver of the privilege." *Id.* (quoting *Klein* v. *Harris*, 667 F.2d 274, 287-89 (2d Cir. 1981)). "When a witness who has previously testified voluntarily about the contents of certain confidential marital communications seeks, later, to invoke the privilege to protect other communications, the court is confronted with a significant danger of distortion. To uphold a claim of privilege in such a case would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony." *Id.* (internal citations and quotations omitted).

The Government has disclosed the substance of the information provided by the Spouse to the Government that could arguably fall within the privilege. As discussed, the privilege does not extend to the Spouse's statements about the Spouse's own conduct or observations, see *Estes*, 793 F.2d at 467 ("Acts do not become privileged communications simply because they are performed in the presence of the actor's spouse."), and the defendant does not contend otherwise. The contested communications are as follows, in substance:

- Communications between the defendant and the Spouse concerning the establishment and use of their joint foreign accounts.

16

- The defendant informed the Spouse that the defendant maintained an individual account at Credit Suisse in Switzerland, and on at least occasion noted that the account was doing well.

- The defendant informed the Spouse that the defendant's father (the "Father"), who is now deceased, had money saved away, and that the defendant assisted the Father in establishing an account at Credit Suisse in Switzerland. The Spouse understood that the defendant had the right and ability to access the funds in the Credit Suisse account the defendant helped establish for the Father based on conversations in which the defendant spoke about using funds in that account to buy an apartment for the defendant and the Spouse.

In light of the fact that the defendant and the Spouse were jointly and illegally concealing foreign accounts from the IRS, including by falsely affirming on their joint tax returns each year that neither had an interest in any foreign accounts, any communications between them about the very accounts being concealed clearly fall within the joint crime exception. *See Estes*, 793 F.2d at 466, 468 (where ex-spouse jointly involved in counting, hiding, and laundering stolen money, the ex-spouse's testimony dealing with any communications pertaining to the handling and disposition of the stolen money was appropriately admitted under joint crime exception).

Additionally, the defendant waived any confidential marital communications privilege as to her statements about the Father's Credit Suisse account (which she helped establish, and in which she had an interest) and her own account (held in the name of the Gestino Stiftung, and into which the secret inheritance from the Father was deposited), by testifying about the subject matter of these communications during a deposition on March 18, 2008 in connection with her pending divorce, attached hereto as Exhibit 1.

The Government understands that the status of the funds in the Father's Credit Suisse account, and the defendant's interest in them, was a hotly contested issue in the defendant's divorce, and that the defendant took additional steps to further conceal and protect those funds and

17

their location not only from the IRS but also from the Spouse (who had previously been a party to the defendant's illegal concealment, but then became a victim) during their divorce.  For example, on May 15, 2007 (after the defendant and Spouse's separation in 2006 but prior to the deposition and formal divorce), the Gestino Stiftung entity changed the listed beneficial owners of the deposits held by the entity at Credit Suisse to the defendant's children.  Indictment ¶ 30.

During the defendant's deposition, the defendant was questioned at length about the statements she had made to the Spouse about funds in the account she had helped her Father establish at Credit Suisse, and to which she had access.  In response to those questions during the deposition, the defendant admitted certain conduct relating to the funds in the Father's Credit Suisse account, but testified falsely about her full knowledge of, and control over, the funds. Specifically,  the defendant stated in the deposition, in substance and in part, that in the late 1990s the defendant provided the Father with the contact information of a Credit Suisse banker in Switzerland, and that the Father thereafter established an account with Credit Suisse for the purpose of transferring money to the defendant's children.  However, the defendant claimed, in substance and in part, that she did not know if the Credit Suisse account established by the Father, who died in 2003, still existed; that only a Credit Suisse banker in Switzerland would have knowledge of the status of that account; and that the defendant did not know whether a trust was involved in managing the money that the Father had placed in the account for the defendant's children.  Nonetheless, the defendant asserted that she believed Credit Suisse would ensure that the defendant's Children would be given the money from that account when it was due to them. Ex. 1 at tr. 158-163, 168-172.

18

The defendant's voluntary testimony about these topics "in fairness places [the defendant] in a position not to object to further disclosure" for multiple reasons. *281 Syosset Woodbury Rd.*, 71 F.3d at 1072.   First, the defendant's testimony was voluntary, extensive, and specific. *See United States* v. *Pugh*, 162 F. Supp. 3d 97, 111 (E.D.N.Y. 2016) ("Moreover, the narrowness of the marital communications privilege is particularly salient with regard to disclosure to third parties.  Indeed, courts writing after *Wolfle* appear to take the view that any disclosure of marital communication destroys the privilege.").  Second, the defendant put these topics at issue in the divorce litigation and resulting deposition by fraudulently concealing the secret inheritance and failing to list it as an asset during the divorce.  Third, the defendant used her voluntary testimony as a means of furthering the fraud by testifying falsely about her full knowledge of, and control over, the funds that had been in the Father's Credit Suisse account.  This case presents a perfect example of a situation in which the absence of additional testimony concerning the relevant marital communications would present "a significant danger of distortion." *Id.*

The defendant cites *In re Erie County*, 546 F.3d 222 (2d Cir. 2008), but that case is inapposite.  In *Erie*, the Court held that deposition testimony did not waive the attorney-client privilege when the deponent's counsel "terminated the inquiries when [the deponent] began to elaborate on the specifics" of confidential attorney-client communications, "and the principal substance of the attorney-client communications was not revealed."  By contrast, the defendant here testified at length, in detail, and without any assertion of privilege about the funds in the Father's Credit Suisse account.  The *Erie* court also pointed to the fact that the adverse party had not been disadvantaged as a result of the limited disclosure. *Id.*  Here, by contrast, the defendant used her voluntary testimony as a means of furthering a fraudulent scheme to conceal assets, with

both the Government and the Spouse (after the dissolution of the marriage) being victimized by that scheme.

## V. The Defendant's Discovery Obligations

At the initial conferences in this matter, defense counsel stated that there would be a defense case which would take no longer than two weeks.  The defense has reciprocal obligations under Rule 16(b), including but not limited to allowing inspection and copying of any books, papers, documents, data, photographs, and tangible objects which are in the defendant's possession, custody or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial.  The Government requested such reciprocal discovery in its August 15, 2016 initial discovery letter, but the defendant has failed to produce any materials in response to that request or otherwise provide a response.  The Government request that the Court direct the defendant to either produce discovery or represent that the defense case will not involve any Rule 16(b) materials.

## CONCLUSION

For the foregoing reasons, the defendant's discover motions should be denied.

Dated: New York, New York
       December 9, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                                By:  _____/s/ Jared Lenow_____
                                     Jared Lenow/ Katherine Reilly
                                     Assistant United States Attorneys
                                     (212) 637-1068

20